IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN OIRYA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-681-WC |
| | ) | |
| AUBURN UNIVERSITY and | ) | |
| GEORGE FLOWERS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Oirya ("Plaintiff" or "Oirya") has brought claims against Auburn University ("Auburn") and George Flowers ("Flowers") (together, "Defendants") in connection with his admission and subsequent disenrollment at Auburn Graduate School's College of Business. Defendants have filed a Motion for Summary Judgment (Doc. 79), and Plaintiff has filed a response (Doc. 99). Defendants' motion is fully briefed and is ripe for consideration. For the reasons below, the Court finds that the Defendants' Motion for Summary Judgement is due to be GRANTED.

## I.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). "An

issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Vehicleriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties

must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the nonmovant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant.  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255.  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).  Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If

the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

## II.  SUMMARY JUDGMENT REQUIREMENTS

Before setting out the undisputed facts in this case, the Court finds is necessary to set forth the provisions governing factual assertions and evidentiary submissions for summary judgment motions.   Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure requires that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of material in the record…."   Additionally, this Court's Uniform Scheduling Order (Doc. 22), contains the following requirements with respect to dispositive motions:

- In all briefs filed by any party relating to the motion, the discussion of the evidence in the brief must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document.   Failure to make such specific reference will result in the evidence not being considered by the court.   Doc. 22 § 2.

- All briefs in support of and in opposition to the motion shall be accompanied by an appendix which includes the evidence upon which the parties rely. *Id.* at § 2, ¶ 6.

- Any discussion of evidence in a brief must include the specific reference, by page and line, to where the evidence can be found in the supporting evidentiary appendix or in a court pleading or other filing (complaint, answer, brief, etc.). *Id.* at § 2, ¶ 7.

- Failure to comply strictly with these provisions could result in dismissal of the motion or appropriate sanctions. *Id.* at § 2, ¶ 9.

Plaintiff filed a Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 99) along with a Declaration of the Plaintiff (Doc. 99-1) and an "Appendix" listing Exhibits A through F on the cover.   Only Exhibits A and B (copies of

4

two emails from Chris Anthony to George Crandall) are actually attached to the Appendix. Exhibit C, identified as a Maran White Letter to Plaintiff's Counsel, is not attached, but a portion of the letter is incorporated into Plaintiff's brief. Exhibit D is identified as "OIRYA-AMDC – Documents Produced in the Middle District," Exhibit E is identified as "AUBURN [Bates No.]," and Exhibit F is identified as "BYU Confidential Documents." None of these documents were filed into the record.

Not only did Plaintiff fail to submit many of the evidentiary materials on which he relies, but his brief fails to conform to the Court's Scheduling Order regarding proper citations to evidentiary materials. First, some factual allegations have no citation at all. Second, when Plaintiff does include citations, he mostly cites to the page only with no line cite. Third, some of the citations are completely improper, as in one example when he attempts to support a factual allegation by citing to a discovery *request* (not even a *response*) that he propounded to Defendants.[1] *See* Doc. 99 at 12. Fourth, the vast majority of Plaintiff's evidentiary citations in his brief refer to the "OIRYA-AMDC" documents that have not been submitted to the Court, making it impossible for the Court to determine whether the cited materials support his factual allegations. Plaintiff occasionally cites to documents produced to him with the Bates-label prefixes "AUBURN" or "BYU Confidential Information." Again, however, Plaintiff submitted none of these documents with his evidentiary materials. Some of the cited pages may have been produced by Defendants in support of their motion; some may not have. However, the Court is

---

[1] Plaintiff lists his student comparators and, as evidentiary support, cites to his Document Request No. 19 to Defendants asking for documents on the students he identified. Obviously, his document request regarding certain individuals does not support a conclusion that they are valid comparators.

unwilling to comb through more than 1000 pages of Defendants' evidentiary materials to find, for example, AUBURN 00034. *See* Pl.'s Br. at 19. As Plaintiff was advised in the Uniform Scheduling Order, the failure to submit evidentiary materials and make specific page-line references will result in the evidence not being considered. Doc. 22 § 2.

When a party files an affidavit in support or opposition to summary judgment, Rule 56(e) requires that the affidavit "be made on personal knowledge, set out facts that would be admissible into evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). According to the Federal Rules of Evidence, personal knowledge can be established by showing that the witness was in a physical position to see, hear, or otherwise perceive the matters to which the testimony relates. *See* Fed. R. Evid. 602. In this case, Plaintiff's declaration is replete allegations not based on personal knowledge, along with arguments and conclusory statements with no supporting factual basis. *See generally* Doc. 99-1.

As a result of the scant evidentiary submissions and the improper assertions in Plaintiff's declaration, the Court has considered only a limited number of factual assertions in Plaintiff's brief and declaration. *See Pye v. Fifth Generation, Inc.*, No. 14CV493, 2016 WL 9046788, at *2 (N.D. Fla. Sept. 27, 2016) (stating that a district court need not consider materials that are not properly cited and may decline to consider evidence supporting the assertions for which t plaintiffs provided no citations to the record).

III.   **STATEMENT OF UNDISPUTED FACTS**

(A)   **Undisputed Facts Agreed-Upon by the Parties**

The Scheduling Order in this case directed the parties to confer and agree upon the facts that are uncontested, and it further advised that the Court would rely upon the parties' representations in its determination of whether there is a genuine issue of material fact. Doc. 22, ¶ 5. The parties were able to agree on the following undisputed facts:

1.     Oirya applied and was admitted to Auburn University's Graduate School ("Graduate School") in the Department of Management Ph.D. program to begin Fall 2012.

2.     Oirya declined the offer to enroll in Auburn for Fall 2012.

3.     Oirya declined Auburn's 2012 offer of admission because he planned to spend time on grant work on-site in Kenya, Africa, during the 2012–2013 academic year.

4.     Oirya remained enrolled at BYU from Spring Term 2011 through March 20, 2013. Oirya has not returned to Kenya since coming to the United States in 1997.

5.     On March 1, 2013, Oirya was suspended from BYU.

6.     In Spring 2013, Oirya applied and was admitted to Auburn again. He enrolled and began coursework in Spring 2014 and began teaching as a graduate teaching assistant.

(B)   **Additional Findings of Undisputed Facts**

After a thorough review of the parties' briefs and *properly cited and submitted* evidentiary materials, the Court finds that the following material facts are undisputed:

(1)   Oirya's Applications to Auburn

When Oirya applied for admission to Auburn's Graduate School in 2012, the application showed that he was enrolled at BYU and expected to receive an MA Graduate

Certificate in TESOL[2] in April 2012. Doc. 81-1 at 135. When he applied again on January 20, 2013, under the heading "Academic Record" on the application, which instructed an applicant to "[l]ist in order (most recent first) all colleges and university you have attended," Plaintiff indicated that his most recent college or university attended was BYU in 2008. Doc. 81-1 at 161, 167. Although Oirya was enrolled at BYU when he completed the application, he did not list any colleges or universities that he attended after 2008. Doc. 81-1 at 161. Oirya signed his application to the Department of Management on January 20, 2013, "certify[ing] that the information [he] provided [was] complete and accurate." Doc. 81-1 at 167. Oirya also completed application materials directly to the Graduate School in connection with his 2013 application, and he reported that his attendance at BYU had ended in December 2008. Doc. 81-5 at 59. This online application contained the following certification: "I understand that withholding information requested on this application, including attendance at any other institution, or giving false information may make me ineligible for admission to the university or subject to dismissal." Doc. 82-7 at 4.

(2) Oirya's Explusion from BYU

On or about January 8, 2013, before he applied to Auburn, Oirya received notice from BYU of allegations of inappropriate behavior toward female students. Doc. 82-2 at 129. On or about January 10, 2013, he received notice from BYU of allegations of falsely claiming that he was receiving funding from the Ministry of Higher Education in Kenya;

---

[2] TESOL is an acronym for Teaching English to Speakers of Other Languages.

knowingly making false claims as to the amount he was receiving from the Kenyan Ministry of Higher Education; submitting forged documents to verify the funding; knowingly and fraudulently attending BYU while not securing required funding; misrepresenting the source of the funding; and never providing evidence of receipt of funds he claimed to have received. *Id.* at 124. On or about January 11, 2013, Oirya received notice from BYU that he was no longer eligible for employment of any kind at BYU due to numerous complaints, including "inappropriate comments and behaviors" toward female staff, dating back to 2005. *Id.* at 132. On January 24, 2013, BYU sent notice to Oirya that he was being accused of Title IX violations (putting his hand down his unzipped pants during class in the presence of at least one other classmate and calling a meeting to inquire about who made the allegation). *Id.* at 133. On January 25, 2013, Oirya received two forms entitled "Allegation Information and Invitation to Respond" from BYU. *Id.* at 134–35. The first one alleged that he had plagiarized an assignment in Spring 2011 and had been denied admission to the Linguistics Masters in Fall 2012 based partly on a failure to attribute quotations to correct authors in his proposal, and it also mentioned the incident of placing his hand into his open pants and engaging in retaliatory behavior by inquiring as to who made the statement. *Id.* at 134. The second form contained the same allegations listed in the January 20, 2013, notice from BYU concerning funding. *Id.* at 135.

On or around March 1, 2013, BYU sent a letter to Oirya stating as follows:

> After interviewing you, completing a thorough review of available information and considering the recommendation made by the Honor Code Committee, I am suspending you from Brigham Young University because of violations of the Honor Code. These violations include submitting false documents, plagiarism and sexual harassment. This action makes you

ineligible to attend daytime or evening classes, to register for other courses, to work for the university, or to reside in BYU-contracted housing. You may not enroll in or be enrolled in any BYU classes or course that could apply to graduation, including but not limited to Independent Study courses, until you are returned to good Honor Code standing. A hold has been placed on your record which will prevent you from being considered for admission to any church Educational System school until you are returned to good Honor Code standing.

Doc. 81-1 at 124. Approximately three weeks later, however, BYU determined that Oirya would be permanently dismissed and sent him a letter dated March 20, 2013, which stated in part as follows:

After carefully reviewing your most recent violations of the Honor Code, i.e., inappropriate gender-based behavior and admission fraud, and in light of your past history of misconduct at the university I have determined to dismiss you from Brigham Young University. This decision is effective immediately and means you are permanently dismissed from the university and will not be allowed to reapply for admission to the university in the future. This action requires you to sever all formal connections with the university, including course work, university employment, and living in BYU-contracted housing, effective immediately…. A notation of this action will be made on your transcript.

Doc. 82-1 at 122.

(3)     Oirya's 2013 Admission to Auburn

In April 2013, unaware that Oirya had been expelled from BYU in March 2013, Auburn admitted him to the Graduate School. Doc. 81-3 at 80. Oirya deferred his Fall 2013 enrollment to Spring 2014 because there was an issue with his immigration status. Doc. 82-4 at 19–20. Oirya enrolled without submitting a complete final transcript from BYU, but this mistake was not caught by the Graduate School before he started classes. Doc. 81-5 at 61–63; Doc. 82-4 at 21.

(4)    Auburn's Graduate Student Policies

Academic Good Standing:   Each Auburn University Bulletin published in June 2011, June 2012, and May 2013 has a section entitled "The Graduate School." Doc. 81-9 at 104, 107, and 109.   Under "Admissions Requirements" it states, "The applicant must be in academic good standing at the institution last attended." *Id.* at 104, 107, and 111. During the tenure of Dean Flowers, who has been the head of the Graduate School since 2008, the Graduate School policy on "academic good standing" has consistently been interpreted to require an applicant to be eligible to re-enter the institution last attended. Doc. 82-7 at 1, 14–15.   Whether stated as "academic good standing" or "good standing," Dean Flowers has never interpreted the term "academic good standing" to be limited to a grade-point-average requirement only. *Id.* at 15.   Regardless of the basis for ineligibility at the prior institution—whether academic status, conduct-based, a combination of the two, or something different—ineligibility to return to the student's prior institution makes one ineligible for admission to Auburn's Graduate School. *Id.* at 13.

Transcripts:  Under "The Graduate School" subheading of "Application for Admission," the policy states that an applicant must submit "[o]ne official transcript of all undergraduate- and graduate-level study from each school previously attended." Doc. 81-9 at 104, 107, and 111.   It further provides that an applicant "must submit transcripts of all completed study, as well as incomplete transcripts from the current institution" and that "[a]pplications and all relevant material must be received by the Graduate School at least forty-five days before the first day of class of the semester in which the student wishes to begin graduate study…." *Id.* The Graduate School requires completed official transcripts

from every college an applicant has attended up through the time of the student's enrollment at Auburn. Doc. 82-7 at 2–3, 13–14.

<u>Transfer Students</u>: Auburn has another policy entitled "Admission of Transfer Students and Transfer Credit." Doc. 81-9 at 85. This policy requires that applicants "provide official transcripts (not duplicated or faxed copies) from each college attended," and have "eligibility to re-enter the institution last attended . . . to be considered for transfer admission." *Id.* This policy appears in the Auburn University Bulletin in June 2011, June 2012, and May 2013 under the heading "Academic Policies" and the subheading "Policies and Procedures for Freshman Admissions." *Id.* at 89, 94, and 100. However, additional policies under the subheading "Policies and Procedures for Freshman Admissions" also include "Admission to Graduate Standing," which sets forth some of the requirements for admission to graduate standing and suggests that the policies under the heading "Policies and Procedures for Freshman Admissions" are not limited to undergraduate freshmen. *Id.* at 90 and 95.

Dean Flowers testified that this transfer policy, despite its location in the admission materials, applies to all admissions and not just freshman admissions. Doc. 82-7 at 14. According to Dean Flowers, every graduate student comes from another institution (either with additional coursework or a completed degree) and is, therefore, a transfer student. *Id.* at 2. During Dean Flowers' tenure, the Graduate School has always required an applicant to be eligible to re-enter his or her previous institution. *Id.* at 14–15.

Graduate Teaching Assistants: During Dean Flowers' tenure, Auburn's policy on graduate teaching assistants has always been that a student must be enrolled and registered for at least one course to be employed as a graduate teaching assistant. Doc. 82-7 at 12.

Revision of Good Standing Policy: In connection with applying the "good standing" policy to Oirya's situation, Auburn restated the policy for purposes of clarity in the 2015–16 academic year. *Id.* at 15. The Graduate School admissions requirements were revised to state that applicants must be in "good standing," and the transfer student policy was included under the Graduate School admission requirements. *Id.* at 15–16.

(5) Audit of Oirya's Admissions File

In February 2015, Auburn received an unsolicited letter from someone identifying herself as Joni Whitaker, which stated in part:

> Lying is a way of life for John, I've learned…. Once he was gone (to attend Auburn University) and I was free from the nightmare I had been living in, I began to reflect and to realize what he had done. That is when I finally filed for the annulment. Within the first week that we were married, John told me for the first time that he had been expelled from Brigham Young University. He claimed to be innocent, but showed me a stack of papers depicting the multiple arrests that he had received on campus at BYU. John had elaborate stories to illustrate how he had been victimized by BYU, but as I've gotten to know him better, I believe those were just elaborate lies, as well. He was expelled when a female student accused him of indecent exposure and inappropriate behavior. On top of being expelled, he was banned from libraries and other buildings on campus. The President of BYU actually told him in a letter to pack his bags and leave.

Doc. 81-3 at 82; Doc. 82-7 at 2. After receipt of this letter and based on his understanding that the Graduate School's policy required Oirya to be eligible to re-enter his previous university, Dean Flowers spoke with the BYU Associate Student Life Vice President and Dean of Students Vernon Heperi, who confirmed by telephone that on March 20, 2013,

BYU had permanently dismissed Oirya based on violations of BYU's Honor Code, including inappropriate gender-based behavior, admission fraud, and a history of misconduct. Doc. 82-7 at 3. Dr. Heperi also reported that BYU had informed Oirya of his ineligibility for re-admission to BYU in the future, and he subsequently confirmed this information by letter to Dean Flowers dated February 18, 2015. *Id.*

After receiving the letter from Ms. Whitaker, the Graduate School reviewed Oirya's admissions file and realized that he had never submitted a final transcript from BYU. *Id.* at 2. The Graduate School's file contained Oirya's BYU transcript showing in-progress classes being taken in Fall 2011, but it showed no grades for those courses and no information about classes taken after Fall 2011. *Id.* at 2, 19–20. Accordingly, the Graduate School requested that Mr. Oirya provide his complete and final BYU transcript. *Id.* at 3–4.

On February 20, 2015, Dean Flowers wrote to Oirya requesting a complete official BYU transcript, and he asked Oirya to sign a release for BYU to provide his complete transcript "and any other information concerning [his] standing at" BYU. Doc. 81-3 at 86. Dean Flowers also reminded Oirya of the certification he provided on his online application:

> I understand that withholding information requested on this application, including attendance at any other institution, or giving false information may make me ineligible for admission to the university or subject to dismissal. I have read this application and certify that the statements I have made on this application are correct and complete, including a report of all college work attempted or completed.

*Id.*  Oirya responded that same day by suggesting that he voluntarily left BYU, stating, "I discontinued my enrollment at BYU mid-semester during Winter 2013.  As a result, I earned no grades for Winter 2013 semester at BYU." Doc. 81-3 at 95.  He also provided a transcript showing that he was enrolled at BYU for classes during Spring 2013, but it did not show his grades. Doc. 82-7 at 4.  Dean Flowers responded by explaining that university policy requires complete transcripts from all coursework attempted at a previous institution. Doc. 81-3 at 96.  On February 21, 2015, Oirya offered to request that BYU provide a transcript as of February 1, 2013, which, of course, would not have provided Oirya's Spring 2013 grades or anything that BYU might have placed on the transcript after that date. Doc. 81-3 at 97; Doc. 82-7 at 5.

On February 21, 2015, Dean Flowers agreed to contact BYU's registrar's office as Oirya requested but "reserve[d] the right to seek additional information about your overall standing at BYU at the time you last attended." Doc. 81-9 at 26; Doc. 82-7 at 5.  BYU's registrar's office responded that they "could tell [Dean Flowers] nothing about" Oirya's records. Doc. 81-9 at 28; Doc. 82-7 at 5.  He again requested on February 24, 2015, that Oirya produce the BYU transcript. Doc. 81-9 at 28.  Finally, on February 25, 2015, the Graduate School received Oirya's final BYU transcript that was required to have been produced to Auburn before Oirya began classes. Doc. 82-7 at 6.  The transcript revealed a W, as in "withdrew," for Oirya's 2013 courses. Doc. 82-3 at 78.

On February 26, 2015, Dean Flowers informed Oirya that he had reviewed the transcript from BYU, which showed he had been withdrawn in Spring 2013, and asked Oirya to "explain why [he] failed to inform us in [his] application to Auburn University

about [his] attendance at BYU between 2011 and 2013" and why he had not provided the complete transcript with his Graduate School application. Doc. 81-3 at 101; Doc. 82-7 at 6–7. Dean Flowers also asked that Oirya "explain the circumstances that lead to [his] withdrawal from BYU in early 2013." *Id.* In response, Oirya seemed to contend that he had submitted the required transcript to the Management Department, but neither the Graduate School nor the Department was able to corroborate his claim. Doc. 81-3 at 103; Doc. 82-7 at 7. Oirya again suggested that he had chosen to leave BYU and made no acknowledgment that he had been expelled:

> I began contemplating my departure from BYU some years . . . . I withdrew from BYU . . . Having experienced and having been a victim of a series of BYUs oppressive, deceptive, hypocritical, racist, and illegal operations . . . . it was time for me to leave BYU . . . . BYU engages in illicit activities of hiring criminal terrorist who pose as "administrators." These hired goons' primary job is to witchhunt, intimidate, bully, trump-up charges against, and terrorize students who question BYU's illicit activities . . . It was not a decision that instantly occurred on March 20, 2013 for me to leave BYU. My decision was a culmination of a series of soul-searching events . . . . I left BYU in 2013 following my disagreement and disappointment with the university….

Doc. 81-3 at 104–05.

On February 27, 2015, Dean Flowers emailed Oirya and asked directly: "Were you a student in good standing with BYU when you withdrew from classes in Spring 2013." Doc. 81-9 at 60. At this point, Oirya admitted that he "would not consider [himself] in good standing with BYU when [he] left in 2013." *Id.* Oirya attributed his lack of good standing to "the series of BYU's (and its sponsor Mormon sect's) institutionalized and systematic racism, bigotry, witch-hunting, bullying and other forms of horrible mistreatment that were meted against me and practically all other black students." *Id.*

The details surrounding Oirya's dismissal from BYU were not, however, relevant to the Graduate School's inquiry, as Dean Flowers was trying to determine Oirya's initially eligibility for admission to Auburn. Doc. 82-7 at 8.

### (6)    Auburn's Decision Concerning Eligibility

After receiving Oirya's own confirmation that he was not in good standing at BYU, Dean Flowers determined that Auburn must discontinue Oirya's enrollment at Auburn unless he could demonstrate that he was in good standing at BYU.[3] Doc. 82-7 at 8. On March 9, 2015, Dean Flowers met with Oirya to communicate that decision, and he delivered a letter to Oirya documenting the decision. Doc. 81-3 at 108; Doc. 82-7 at 8. The letter stated:

> It appears that at the time of your withdrawal from classes at BYU (March 2013) you were not a student in good standing with that institution.
>
> Auburn University rules require that an applicant must be in academic good standing at the institution last attended in order to be admitted to the Graduate School. This requirement is clearly stated in the AU Bulletin and on the AU

---

[3] Before Auburn's receipt of the letter from Ms. Whitaker letter, some of his graduate school colleagues and students had complained about his behavior within the Management Department. A female graduate student and a student both reported being uncomfortable around him. Doc. 81-1 at 199; Doc. 81-6 at 48–50; Doc. 82-1 at 52–53; Doc. 82-5 at 8–11. In May 2014, he was placed on academic probation because his grades fell below the 3.0 threshold. Doc. 81-1 at 202; Doc. 82-1 at 57. In January 2015, a colleague reported his "constant muttering of the phrase 'rape a student.'" Doc. 81-6 at 48–49; Doc. 82-5 at 11–12. The Department Head Christopher Shook referred the matter to Auburn's Threat Assessment Team, which reviewed the information regarding Oirya but took no action. Doc. 82-5 at 11. In February of 2015, Dr. Shook inquired about Oirya with BYU. Casey Peterson, a student affairs official at BYU, told Shook that he "should be very concerned for [the] students[.]" Doc. 81-6 at 51–52; Doc. 82-5 at 12–13, 23. After further consultation with College of Business leadership, Dr. Shook asked the University's Threat Assessment Team to reassess the Oirya matter, but no action was taken. Doc. 82-5 at 25, 28. While Oirya's admissions issues were being addressed by the Graduate School, the Department of Management relieved Oirya of his teaching responsibilities as a graduate teaching assistant on February 22, 2015. Doc. 82-1 at 39; Doc. 82-5 at 25. He had no classroom duties but continued in his status as a graduate student and received his stipend as a graduate assistant for the entire Spring 2015 semester. Doc. 82-1 at 39. Dean Flowers was generally aware of but not involved in the Management Department's activities relative to Oirya, and the Management Department was not involved in the Graduate School's admissions inquiry or decision. Doc. 82-7 at 11–12.

Graduate School application web site. In addition, AU policy requires that an applicant, as part of the application process, certify that:

> *I understand that withholding information request on this application, including attendance at another institution, or giving false information may make me ineligible for admission or subject to dismissal.*

> At the time of your acceptance for graduate studies at AU, the information regarding your standing at BYU was not provided by you. Accordingly, I am rescinding your admission to the Auburn University Graduate School. You will be withdrawn from your Spring 2015 semester classes and any tuition or fees that you have paid will be refunded. Your graduate assistantship will also end immediately since you will no longer be a graduate student.

> If you can provide any additional document to demonstrate that the above information regarding your status at BYU is incorrect, please provide that documentation immediately.

*Id.* At the March 9th meeting, Oirya indicated that he would produce documentation demonstrating his good standing at BYU. Doc. 82-7 at 9. To give Oirya more time, Auburn did not implement its disenrollment decision immediately. *Id.* On March 10, Dean Flowers emailed Oirya asking about the status of documentation. Doc. 81-9 at 65. On March 11, Dean Flowers emailed Oirya again reminding him that "[i]t is the responsibility of an applicant to supply accurate and complete information. Failure to do so is grounds for dismissal." Doc. 81-3 at 109. Oirya responded, in part, by stating that he "left BYU for ecclesiastical standing reasons" and that "[n]o where in Auburn University's policies am I required to submit to Auburn University my 'ecclesiastical standing' at BYU at the time that I last attended." Doc. 81-9 at 67. On March 13, Oirya wrote to Dean Flowers and attached a document that, according to Oirya, demonstrated

that he was in "good academic standing" at BYU.[4] *Id.* at 69–73.   Dean Flowers responded by stating, "The question is whether you were in good standing to return to BYU at the time you were accepted to admission to Auburn and if not, why not." *Id.* at 69.   On March 23, 2015, Dean Flowers wrote to Oirya again asking for documentation of Oirya's eligibility to return to BYU. *Id.* at 76.

On March 24, 2015, Oirya emailed Auburn's AA/EEOC office explaining that he was filing a charge of discrimination against Dean Flowers because he was being forced to "verify [his] religious standing" at BYU. *Id.* at 74.   Dean Flowers, who was copied on Oirya's email, responded by (1) pointing out that he had never inquired about Oirya's religion and (2) asking Oirya whether the sole reason he could not return to BYU was because he changed his religious beliefs. *Id.* Oirya's response: "That is exactly right." *Id.* at 78.

By March 24, 2015, Oirya had not produced anything to the Graduate School showing his eligibility to return to BYU. Doc. 82-7 at 10.   By April 2015, Oirya had engaged legal counsel, and Auburn continued to await information from him regarding his standing at BYU and his failure to be forthcoming about that status. *Id.* at 11.   When Oirya still had not shown his eligibility to return to BYU by May 7, 2015, the previous decision to discontinue Oirya's enrollment was implemented and formally communicated to Oirya's attorney on May 7, 2015. *Id.* at 22.   Auburn's General Counsel wrote to Oirya's attorney stating:

---

[4] This document from BYU states that "academic good standing" means having a minimum GPA of 2.0. Doc. 81-9 at 72.

> Auburn allowed [Oirya] to finish the Spring 2015 semester despite
> repeatedly missing deadlines to produce complete and accurate information
> regarding his standing at BYU. However, please note that Mr. Oirya is not
> permitted to register for or attend classes at Auburn again until this matter
> has been resolved. We look forward to receiving the relevant records from
> you so that Auburn can move forward with a determination of Mr. Oirya's
> future standing the Graduate School.

*Id.* Because a student must be enrolled in a degree-seeking program at Auburn and registered for at least one course in order to be employed as a graduate teaching assistant, Oirya became ineligible to hold a graduate assistantship at Auburn. *Id.* at 11–12. His last day as a graduate assistant was May 31, 2015. *Id.* at 11.

### (7)    Oirya's Request for a Disability Accommodation

On March 17, approximately one week after Oirya's meeting wherein Dean Flowers advised that his admission was being rescinded, Oirya contacted the Office of Accessibility, which is the office that works with students who need academic accommodations. Doc. 81-8 at 2. When requesting an accommodation, students must submit documentation from a licensed medical professional of the diagnosis on which the request is based, and the office will request the medical professional's opinion as to the student's functional limitations and the requested accommodation. *Id.* at 2–3. On Oirya's intake form, he reported that accommodations to "extend[] my deadlines would help. I wouldn't mind taking 'incomplete' grades if that is possible." *Id.* at 3, 15. When advised that he would need documentation of a medical professionals' diagnosis, Oirya provided letters from on-campus counselors who had seen him on occasion for counseling, but the letters did not provide the required diagnosis or information regarding functional limitations. *Id.* at 4, 17–18. Despite never having provided the required information

concerning diagnosis and functional limitations and even though he did not ask for an accommodation until March 17, one teacher allowed him an extra day before taking a test that was scheduled on March 19, and two other professors granted his request for a two- to three-week extension of time. *Id.* at 4–5; Doc. 82-1 at 56. After March 19, 2015, Oirya never contacted the Office of Accessibility or took additional steps to seek accommodations. Doc. 81-8 at 5.

(8)    Oirya's Lawsuit and EEOC Charge

Oirya filed this lawsuit on October 10, 2017. Doc. 1. He filed an EEOC Charge of Discrimination on November 27, 2017. Doc. 81-1 at 128. In the Charge of Discrimination, he alleged that "[o]n August 21, 2017, all Graduate Assistants were assigned their job duties, except for me." *Id.* The charge mentions nothing about being disenrolled from school or his graduate assistantship being terminated in May 2015, and it does not mention the fact that Oirya had no graduate school teaching duties in intervening period between May 2015 and August 2017. *Id.*

## IV.  **DISCUSSION**

### (A)    **Applicable Statutes of Limitations**

Plaintiff's Complaint, as amended, contains the following fourteen causes of action:

| Count 1: | Procedural Due Process |
|---|---|
| Count 2: | Substantive Due Process |
| Count 3: | Equal Protection |
| Count 4: | Class of One |
| Count 5: | Unauthorized Acquisition and Distribution under Title VI, IX, and FERPA |
| Count 6: | Title IX Deliberate Indifference |
| Count 7: | Title VI Deliberate Indifference |
| Count 8: | Title IX Erroneous Outcome |

Count 9:       Title VI Erroneous Outcome
Count 10:      Title IX Selective Enforcement
Count 11:      Title VI Selective Enforcement
Count 12:      1981 Discrimination
Count 13:      Rehabilitation Act/Failure to Accommodate
Count 14:      Title VII

Doc. 116. Defendants argue that all of Plaintiff's claims are barred by the applicable statutes of limitations.

(1)    Constitutional, Title VI, Title IX, and Rehabilitation Act Claims

Plaintiff's Counts 1 through 4 are constitutional claims brought pursuant to 42 U.S.C. § 1983, which are tort actions subject to the personal injury statute of limitations in the state where brought. *Flood v. City of Jacksonville*, 263 F. Supp. 3d 1213, 1218 (N.D. Ala. 2017) (quoting *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008). In Alabama, the applicable statute of limitations is two years. *Daniel v. Talladega Cty. Sheriffs's Dep't*, No. 1:17-CV-01076-KOB, 2018 WL 4304185, at *1 (N.D. Ala. Sept. 10, 2018) (stating that constitutional claims brought under § 1983 are tort claims subject to Alabama's two-year personal injury statute of limitations). Counts 5 through 11, brought pursuant to Titles VI and IX,[5] also have a two-year statute of limitations. *Hurt v. Shelby Cty. Bd. of Educ.*, 198 F. Supp. 3d 1293, 1315 (N.D. Ala. 2016) (holding that Title IX and § 1983 actions were governed by Alabama's two-year personal injury statute of limitations)

---

[5] Count 5 also purports to bring a claim pursuant to the Family Educational Rights and Privacy Act (FERPA); however, the Supreme Court has held there is no private right of action available under FERPA. *A.A. v. Houston Cty. Sch. Dist.*, No. 05-CV-107-WDO, 2006 WL 1193416, at *1 (M.D. Ga. May 4, 2006) (citing *Gonzaga University v. Doe*, 536 U.S. 273, 287, 122 S.Ct. 2268 (2002)); *Arrington v. Helms*, 483 F. 3d 1336, 1344 (11th Cir. 2006) (stating that the Supreme Court has determined that FERPA does not contain rights-creating language because it speaks only to the Secretary of Education); *Williams v. Hillman*, No. CV 08-0081-KD-C, 2008 WL 11425746, at *9 (S.D. Ala. June 17, 2008) (recognizing that FERPA creates no individual right of action for violation of privacy rights).

(citations omitted); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 n.32 (11th Cir. 1999) (recognizing that Title VI claims are governed by the same statute of limitations as § 1983 claims) (citing *Rozar v. Mullis,* 85 F.3d 556, 561 (11th Cir.1996)).   Finally, Count 13, a failure-to-accommodate claim pursuant to the Rehabilitation Act, is also subject to a two-year statute of limitations. *Perez v. Univ. of S. Alabama*, No. CV 18-528-JB-N, 2019 WL 3849164, at *1 (S.D. Ala. Aug. 15, 2019); *Horsley v. University of Alabama*, 564 F. App'x 1006, 1008 (11th Cir. 2014) (applying Alabama's two-year statute of limitations to claims under Title II of the ADA and the Rehabilitation Act).

Although federal courts apply the law of the forum state to determine the applicable statute of limitations, federal law determines the date on which a statute begins to run, and the Eleventh Circuit has held that it begins to run from the date "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."   *Howell v. Proctor*, 136 F. App'x 267, 269 (11th Cir. 2005) (citations omitted); *see also Lovett v. Ray*, 327 F.3d 1181, 1182–83 (11th Cir. 2003) (holding that statute began to run when plaintiff was notified by the defendants in September 1998 that he would not be reconsidered for parole until 2006); *Brown v. Ga. Bd. of Pardons & Paroles,* 335 F.3d 1259, 1261 (11th Cir. 2003) (holding that statute began to run when Georgia Parole Board informed plaintiff of date of his parole reconsideration, which was outside the three-year maximum mandated by policy in place at the time he committed his crime).   A plaintiff must know or have reason to know that he was injured, and he must be aware or should be aware of who inflicted the injury. *Rozar*, 85 F.3d at 562 *(*citing *Mullinax v. McElhenney,* 817 F.2d 711, 716 (11th Cir. 1987)).

Oirya does not dispute that he was removed from his teaching assignments on February 22, 2015; that his requests for accommodations were denied in March 2015; that he was given notice in March of 2015 that his admission was being rescinded and his graduate assistantship was being terminated; that he was given additional time to provide documents proving that he was entitled to re-enter his previous institution; and that in May 2015, having provided no additional documents, Auburn informed him by letter dated May 7, 2015, that he was no longer permitted to register for classes. Thus, in May 2015, Oirya knew he was being disenrolled, knew he would not be allowed to register for classes again, and knew his graduate teaching position was being terminated. In other words, he knew he was injured, and he knew who inflicted the injury. Because Plaintiff waited more than two years after learning of Auburn's decision to file this lawsuit in October of 2017, his constitutional claims and Title VI and IX claims are time-barred. With respect to his failure-to-accommodate claim, the alleged discriminatory action took place even earlier, as it is undisputed that he made the accommodation request on March 17, 2015, that two teachers granted his request for a two- or three-week extension, that one teacher gave him an additional day to take a test on March 19, and that he took no additional steps to seek accommodations after March 19, 2015.[6]

Accordingly, Counts 1 through 11 and Count 13, all of which are subject to a two-year statute of limitations, are barred.

---

[6] The Plaintiff offers no explanation or argument as to why the statute of limitations does not bar his Rehabilitation claim. As explained below with regard to his other claims, he argues that his "discovery" of Auburn's revised "good standing" policy in August 2017 tolled the statute of limitations. However, that admissions policy has no bearing on any alleged failure to accommodate a request under the Rehabilitation Act. In his statute of limitations argument, he does not even mention his failure-to-accommodate claim.

Plaintiff does not dispute in his brief that the above claims are subject to a two-year statute of limitations.   Instead, he argues that all of the applicable statutes of limitation were tolled by the discovery rule and the continuing tort doctrine. Doc. 99 at 34–36.   Both arguments are unavailing.

(a)    Discovery Rule

Plaintiff cites *Therrell v. Georgia Marble Holdings Corp.* in support of his discovery rule argument, but that case holds that Georgia's discovery rule does not apply to conversion claims. 960 F.2d 1555, 1561 (11th Cir. 1992).   He also cites *Trawinski v. United Technologies*, but that case, which involved the installation of an allegedly defective heating and air conditioning unit, holds that the discovery rule, "which might be applicable to statutes of limitations in state tort actions, has no place in a proceeding to enforce a civil penalty under a federal statute" and that the "statute of limitations begins to run with the violation itself [the installation], not the discovery of harm [several years later when the owners discovered the defect]." 313 F.2d 1295, 1298 (11th Cir. 2002).   In short, neither case cited by the Plaintiff supports his argument that Alabama's discovery rule applies to this case.

In fact, Alabama's discovery rule applies only to fraud actions and cases involving the fraudulent concealment of the existence of a cause of action. Ala. Code § 6–2–3 (1975); *Utilities Bd. of City of Opp v. Shuler Bros.*, 138 So. 3d 287, 293 (Ala. 2013) (citing *DGB, LLC v. Hinds,* 55 So. 3d 218, 225 (Ala. 2010)); *Hurt v. Shelby Co. Bd. of Ed.*, 198 F. Supp. 3d 1293 (N.D. Ala. 2016) (holding that Title IX and 1983 claims were governed by

Alabama's two-year personal injury statute of limitations and that the discovery rule did not apply to that statute). In an attempt to interject fraud into this case in order to save his claims, Plaintiff claims he was expelled and terminated under a "fraudulent" policy enacted by Auburn, referring to Auburn's removal of the word "academic" from its good standing policy, and that he did not discover this "newly invented Fraudulent Policy" until August 2017. Doc. 99 at 21, 35. Specifically, he claims he was in "academic good standing" at BYU because BYU defined that term as having a GPA of 2.0 or higher,[7] making no other inquiry regarding his "standing" at BYU necessary, and that Auburn's revision of its policy was somehow fraudulent. Doc. 99 at 15. There are two problems with this argument.

First, the undisputed facts show that Auburn did not *change* the policy; it merely changed the wording of the policy to reflect how it was actually applied. Despite Plaintiff's constant labeling of the policy as "fraudulent," he has failed to allege a fraud claim against Defendants, failed to include any analysis of the requirements of a fraud claim, presented no evidence of any type of fraudulent intent or conduct by Defendants, and failed to explain why Auburn should be prohibited from revising its policies. He has offered nothing to refute Auburn's evidence that its good standing policy requires all graduate students to be eligible to re-enter their previous institutions, that the policy has been consistently applied to all graduate students, and that the terms "academic good standing" and "good standing" are interchangeable with no distinction at Auburn. To be sure, Plaintiff argues that these two words have very different meanings, but he has offered

_____

[7] Plaintiff offers no explanation as to why he concludes that BYU's interpretation of the term "academic good standing" dictates Auburn's interpretation of that term or admission requirements.

no credible facts or legal theory suggesting that they have ever had different meanings at Auburn. It is undisputed that Auburn requires a graduate student to be eligible to re-enter a previous institution, and the change in wording did not alter that policy.

Plaintiff's only attempt at distinguishing between Auburn's use of "academic good standing" and "good standing" is an excerpt from a document he failed to file with the Court. He included the excerpt in the body of his brief, as follows:

> "Only grades in Auburn University courses approved for graduate credit will be used in determining the overall GPA for continuation in the Graduate School…. [A student must] … have a CGGPA [cumulative graduate GPA] of 3.0 or above … [to be considered in academic good standing at Auburn].

Because the document was not submitted with Plaintiff's evidentiary materials, the Court cannot determine how the policy actually reads. The purported limitation on the term "academic good standing" is Plaintiff's own bracketed language. Further, even as written above, the paragraph does not support a conclusion that Auburn's definition of "academic good standing" is based solely on a calculation of a student's GPA. As written, the above policy establishes only that a student's GPA calculation for *continuation* in the Graduate School will be based on classes taken at Auburn. It does not appear to relate to admissions, and it certainly does not limit the term "academic good standing" to a mere GPA calculation for purposes of admission. Plaintiff was permanently expelled from BYU for plagiarism, sexual harassment, and submission of fraudulent documents. Under Plaintiff's theory, a student could brazenly cheat on a final exam at another university, get caught, and get expelled, yet he would still meet Auburn's admission requirements as long as he cheated successfully and kept his GPA above a certain number. Even if this

argument were rational, the fact remains that Plaintiff can present no evidence showing that Auburn has ever limited its application of the "academic good standing" policy to a GPA calculation.

Second, even if this Court were to accept Plaintiff's argument that revising its policy was fraudulent, the discovery rule would not apply. Plaintiff conveniently ignores the fact, at the time his admission was rescinded, he knew it was based on his lack of "good standing" and ineligibility to return to BYU. Dean Flowers' correspondence with Oirya clearly communicated this. Oirya also knew that Auburn's policy contained the phrase "academic good standing" as opposed to "good standing," and he had even drawn a distinction in his own mind between these two terms, arguing to Dean Flowers that he met the requirement of "academic good standing" because of his GPA at BYU. In March 2015 and, at the very latest, on May 7, 2015, Plaintiff knew that Auburn's policy stated "academic good standing" but that he was being disenrolled and terminated for what Dean Flowers called a lack of "good standing." Thus, Plaintiff cannot possibly argue in good faith that a "stunning discovery" in August of 2017 made him aware of any new facts giving rise to his claims. He knew on May 7, 2017, that he had been disenrolled and terminated, he knew who did it, and he knew why. Alabama's discovery rule does not apply in this case.

(b) Continuing Tort Doctrine

Plaintiff also argues that his claims are not time-barred because Defendants' actions are a continuing tort. He points to a letter dated October 22, 2015, from Auburn's general counsel to Plaintiff's attorney. Doc. 99 at 6. The letter was written in response to

Plaintiff's attorney's request for information. Doc. 102-1 at 2. As Oirya points out, the letter states, "[A] final decision has not been made regarding Mr. Oirya's status," and Oirya argues this statement illustrates that Defendants' alleged tortious conduct is continuing. However, Plaintiff omitted a large portion of the letter from his brief. The letter continues as follows:

> After Dr. Flowers sent the March 5 letter to Mr. Oirya, Mr. Oirya indicated that he could provide documentation that clarified his status at BYU, and Dr. Flowers granted Mr. Oirya time to do so. After a month had passed without Mr. Oirya providing any relevant documentation, Auburn received a letter from you on April 6 indicating that Mr. Oirya was working with BYU to correct his records and asking that AU not take any adversarial action regarding Mr. Oirya's standing at Auburn until Mr. Oirya had a chance to do so. Accordingly, in good faith, Auburn allowed Mr. Oirya to complete the Spring 2015 semester. However, when Auburn still had not received any new information from you or Mr. Oirya by May 7, Auburn informed you that Mr. Oirya could not enroll for upcoming classes and that a final decision regarding his status at Auburn would be made once he provided the promised documentation. It has been several months since Mr. Oirya first promised to provide clarifying documentation to Auburn from BYU, and we have yet to receive that information.

Doc. 102-1 at 2. According to Plaintiff, this letter proves that Auburn's "tortuous conduct against Oirya that continues to deprive him of access to his education and employment at Auburn has not ceased, and will not cease until Auburn renders its anticipated 'final decision.'" Doc. 99 at 36.

However, the fact that Plaintiff has an open-ended invitation to submit documents proving that he is eligible to return to BYU so that he can one day re-apply for admission to Auburn does not save his claims. As a practical matter, assuming for the sake of argument that Oirya could somehow restore his eligibility to re-enter BYU, he could wait years before providing Auburn with that information and seeking readmission. Under

Plaintiff's theory, a final decision cannot be made until he submits additional documents and Auburn makes a decision based on those documents.  This argument ignores the purpose of a statute of limitations and case law on the issue. *See Delaware State College v. Ricks,* 449 U.S. 250, 261 (1980) (determining that the statute of limitations began to run when decision denying tenure was made and communicated to plaintiff and that pendency of grievance or method of collateral review did not toll running of the limitations periods); *Bloom v. Alvereze*, 498 F. App'x 867, 874 (11th Cir. 2012) ("In determining whether a violation is continuing, we distinguish single, discrete acts from charges of continuously maintained illegal policies…. The Blooms' claims are akin to an employee being improperly terminated due to his race and not being returned to his position—which would not be a continuing tort."); *Coates v. Natale*, 409 F. App'x 238, 240 (11th Cir. 2010) (stating that student's claim accrued when she learned of the defendants' decision to expel her from college); *Perez v. Univ. of S. Ala.*, No. 18-CV-528-JB-N, 2019 WL 3849164, at *2 (S.D. Ala. Aug. 15, 2019) (holding that plaintiff's ADA and Rehabilitation Act claims accrued on the date he was dismissed from graduate program and that institutional grievances or subsequent investigations did not toll statute of limitations, as plaintiff knew at the time of dismissal that he was injured and who inflicted the injury); *Muckle v. UNCF*, 930 F. Supp. 2d 1355, 1359 (N.D. Ga. 2012) (holding that termination of plaintiff's scholarship was discrete act and not a continuous tort).

These cases are consistent with numerous rulings from federal courts in other jurisdictions as well. *See Boatright v. Am. Acad. of Actuaries*, 208 F.3d 212 (6th Cir. 2000) (stating that statute of limitations began to run upon receipt of certified letter notifying

plaintiff of his expulsion from organization and ability to appeal or overturn decision did not toll statute of limitations); *Kasemeier v. Indiana Univ.*, 99 F.3d 1142 (7th Cir. 1996) (determining that statute of limitations began to run when university informed plaintiff by letter that student status was "terminated" and he was ineligible to enroll in courses, not upon denial of application for readmission, as that would create a "black hole" where plaintiff could obtain a fresh limitations period with each new application for readmission); *Soignier v. Am. Bd. Of Plastic Surgery*, 92 F.3d 547, 551–52 (7th Cir. 1996) (holding that statute of limitations began to run when plastic surgeon's accommodation request to take boards was denied, not when an internal appeal was denied, noting that it is the "discovery of the original act of discrimination, *not* future confirmation of the injury or determination that the injury is unlawful" that triggers statute of limitations, as a refusal to undo discrimination is not a fresh act of discrimination) (emphasis in original); *Davis v. La. State Univ.*, 876 F.2d 412, 413 (5th Cir. 1989) (holding that student's claim accrued when she was expelled and barred from campus and that she could not evade prescriptive period by contending that university's actions amounted to continuing tort) (citing *Taylor v. Bunge Corp.,* 775 F.2d 617, 619 (5th Cir. 1985) ("termination of employment either through discharge or resignation is not a 'continuing' violation because the individual ceases to be an employee on the date of his discharge and all of his legal claims mature at the time")); *Tolliver v. Prairie View A&M, Univ.*, No. 18-CV-1192, 2018 WL 4701571, at *2 (S.D. Tex. Oct. 1, 2018) (stating that student's request to overturn an expulsion did not delay accrual of his claims, as claims accrued when he knew he was expelled, grounds for the expulsion, and procedure that was followed); *Gauer v. Gallaudet Univ.*, 915 F.Supp.2d 145

(D.D.C. 2013) (holding that statute began to run when professor received notice of university's decision not to renew his position or promote him, not the effective date of the non-renewal decision, as plaintiff knew when he received notification letter that his contract would not be renewed and he would not be promoted); *Cordova v. Univ. of Notre Dame Du Lac*, 936 F. Supp. 2d 1003, 1012–13 (N.D. Ind. 2013) (stating that plaintiff knew of university's conduct when she was instructed to vacate her residence and notified that she was no longer a student and that internal appeal process did not toll running of statute of limitations); *LaPiccolo v. Am. Univ.*, 840 F. Supp. 2d 71, 77 (D.D.C. 2012) (finding that statute of limitations began to run when student was notified that athletic scholarship would not be renewed for following academic year although aid was to be continued through end of current semester); and *Allison v. Howard Univ.*, 209 F. Supp. 2d 55, 60 (D.D.C. 2002) (holding that statute began to run when defendants' formal decision regarding expulsion was made and communicated to plaintiff and review of that decision did not toll the statute of limitations).

Here, Oirya was unequivocally notified by the May 7, 2015, letter of Auburn's decision to rescind his admission and terminate his graduate assistantship. As of the end of May 2015, he was no longer enrolled at Auburn, and he was no longer employed by Auburn. Under the case law cited above, the statute of limitations on his claims began to run on May 7, 2015, and Auburn's willingness to review that decision and allow him to re-apply if ever submits documentation showing his eligibility to re-enter BYU does not convert any of his claims into a continuing tort.

For these reasons, neither the discovery rule nor the continuing tort doctrine applies to Plaintiff's claims. Plaintiff did not file his Complaint until October 10, 2017, so his constitutional claims, Title VI and Title IX claims, and Rehabilitation Act claim are all barred by a two-year statute of limitations, leaving only his Title VII and § 1981 claim.

(3)    Title VII Claim

Before a plaintiff may bring suit under Title VII, he must first file a charge of discrimination with the EEOC within 180 days of his employer's last discriminatory act. *Spears v. KMG Enter., Inc.*, No. 18-CV-01548, 2019 WL 121273, at *2 (N.D. Ala. Jan. 7, 2019), *appeal dismissed,* No. 19-10490-D, 2019 WL 2123248 (11th Cir. Apr. 4, 2019) (citing *H&R Block E. Enter., Inc. v. Morris*, 606 F.3d 1285, 1295 (11th Cir. 2010)). If a plaintiff fails to file an EEOC charge within 180 days, the court must dismiss a Title VII claim for failure to timely exhaust administrative remedies. *Id.*

The undisputed facts in this case show that Oirya filed his EEOC charge on November 27, 2017. Doc. 81-1 at 128; Doc. 82-1 at 29. In that charge, he alleged that Auburn had failed to assign him any graduate teaching positions due to his not being in "good standing" with BYU. *Id.* Oirya identifies the date of the alleged adverse action as August 21, 2017. *Id.* However, as set forth above and undisputed by Plaintiff, he was actually removed from his teaching assignments on February 22, 2015; he was disenrolled as of May 2015; and, because he was no longer enrolled, his graduate assistantship was terminated as of May 31, 2015. Although Plaintiff claims that he did not discover Auburn's alleged discriminatory conduct until August 2017, the fact that he filed a discrimination charge with Auburn's AA/EEO office on March 15, 2013, belies this claim.

He filed that charge eight days after he received the letter revoking his admission and ending his graduate assistantship, and he raised the "good standing" issue in that claim. It is completely disingenuous to claim now that he was unaware of any allegedly discriminatory conduct until August 2017. For the same reasons stated above, the discovery rule does not apply, and the time for filing his EEOC charge began to run when the alleged discrimination occurred. *Ricks*, 449 U.S. at 258 (holding that the only alleged discrimination occurred–and the filing limitations periods therefore commenced–at the time the tenure decision was made and communicated to plaintiff, even though one of the effects of the denial of tenure–the eventual loss of a teaching position–did not occur until later); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100 n.19 (11th Cir. 1996) (stating that time for filing an EEOC charge begins to run when employee receives unequivocal notice of adverse employment decision); *Wen Liu v. Univ. of Miami Sch. of Med.*, 693 F. App'x 793, 797 (11th Cir. 2017), *cert. denied sub nom. Liu v. Univ. of Miami Sch. of Med.*, 139 S. Ct. 229 (2018), *reh'g denied sub nom. Wen Liu v. Univ. of Miami Sch. of Med.*, 139 S. Ct. 937 (2019) (holding that time for filing EEOC charge began when teacher received notice that employment was terminated even though the effective date of termination was twelve months later). Again, Oirya received unequivocal notice on May 7, 2015, that his employment was terminated. A charge of discrimination must be filed with the EEOC within 180 days of an employer's last discriminatory act, but Oirya waited two-and-a-half years to file his charge. Thus, the charge was untimely, and his Title VII claim is barred for failure to exhaust administrative remedies.

(4)    § 1981 Claim

Defendants argue that a two-year statute of limitations applies to Plaintiff's § 1981

claim, relying on *Grimes v. Bd. of Regents of Univ. Sys. of Ga*, 650 F. App'x 647, 651 (11th

Cir. 2016).   In that case, the Court explained the statute of limitations for § 1981 cases:

> Prior to 1991, we applied "the most appropriate or analogous state statute of limitations" to claims brought under § 1981. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004).... Congress has since enacted 28 U.S.C. § 1658, which provides a four-year statute of limitations for civil actions arising under federal statutes enacted after December 1, 1990. 28 U.S.C. § 1658(a); *see also Jones*, 541 U.S. at 371–72, 124 S.Ct. 1836. In 1991, Congress amended § 1981 to broaden the definition of the term "make and enforce contracts." *Jones*, 541 U.S. at 373, 124 S.Ct. 1836 (quoting 42 U.S.C. § 1981(b)). Whereas prior to 1991 this phrase referred narrowly to "discrimination in the making and enforcement of contracts alone," *Patterson v. McLean Credit Union*, 491 U.S. 164, 176, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (internal quotation marks omitted and alterations adopted), after the 1991 amendment, the statute also covered post-formation conduct, such as the imposition of discriminatory working conditions. *See* 42 U.S.C. § 1981(b) (defining the phrase "make and enforce contracts" to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"); *Jones*, 541 U.S. at 373, 124 S.Ct. 1836. Thus, we apply a four-year statute of limitations to any § 1981 claim that is cognizable only because of the 1991 amendment and otherwise apply the analogous state statute of limitations. *Jones*, 541 U.S. at 382–83, 124 S.Ct. 1836.

The Court held that the plaintiff's failure-to-admit claim fell within the pre-amendment

version of § 1981 because her claim challenged discrimination in the formation of a

contract (for graduate admission).   Defendants here argue that, because Auburn

determined Plaintiff never met the requirements for admission, his § 1981 claim also

challenges the formation of a contract.   Surprisingly, Plaintiff does not dispute this

argument in his response, but the Court nonetheless finds that *Grimes* is distinguishable

from the instant case.   Unlike *Grimes*, Plaintiff was admitted to the Graduate School,

allowed to enroll in courses, took courses for over a year, and allowed to teach classes as a graduate assistant for more than a year. Accordingly, because Plaintiff was allowed to enroll and begin his position as a graduate assistant, as opposed to being denied admission and employment, the Court finds that his claims are governed by the four-year statute of limitations applies to this claim. *See Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1338 (11th Cir. 2008) (holding that four-year statute of limitations applied to terminated elementary teacher's § 1981 claims); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 384 (2004) (finding that the 1991 Act defined the key "make and enforce contracts" language in 42 U.S.C. § 1981 to include the "termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" and that four-year statute of limitations applied to employee's claims of wrongful termination). For these reasons, the Court finds that the four-year statute of limitations applies to Oirya's § 1981 claim and that it was timely filed.

### (B) Merits of Plaintiff's § 1981 Claims

Plaintiff's only remaining claim is his § 1981 claim. To survive summary judgment in a § 1981 intentional discrimination claim, a plaintiff must make a sufficient factual showing to permit a reasonable jury to rule in his favor. *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1217 (11th Cir. 2019). The burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to § 1981 racial discrimination claims relying on circumstantial evidence. *Spears*, 2019 WL 121273 at *2–3 (citing *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 843 n.11 (11th Cir. 2000)). Under that framework, a plaintiff bears the initial burden of establishing a *prima facie* case of

discrimination by showing he was treated differently from another "similarly situated" individual. *Lewis*, 918 F.3d at 1217 (citations omitted).

While Plaintiff seems to be generally aware of a requirement that he must identify a similarly situated comparator, any understanding of the requirements for establishing a valid comparator ends there. His arguments concerning valid comparators are devoid of any meaningful factual or legal analysis. First, he identifies his comparators as thirteen students enrolled in the Ph.D. program in January 2014, stating that they were "Caucasian males and female, of American and Russian origin, and all non-Kenyan. Oirya was the only Black African male from Kenya, in the PhD program in Management at Auburn during the relevant time period." Doc. 99 at 12. He then argues they were comparators because they were Ph.D. students who held graduate assistantship employment and were "equally in 'academic good standing' at their previous institutions." *Id.* at 42–43, 55–56. He later asserts that all the students "who jointly applied to the PhD program with him during 2012 and 2013 [were granted] timely transcript audits, but [Auburn] denied the same to Oirya."[8] In the declaration he filed with this brief, Oirya states the other Ph.D students were "similarly situated in practically every respect, in relation to their applications to, admission to[,] and enrollment at Auburn, to wit: Their admissions offer letters to Auburn had practically the same terms and conditions;[9] they had the same student

---

[8] Plaintiff seems to be arguing that Auburn is guilty of discrimination because it did not discover sooner that he concealed his final transcript and hid his expulsion from BYU for plagiarism, sexual harassment, and submitting false documents. Although the wisdom of making such an argument seems questionable, the Court notes that he offered no evidence showing when other students' transcripts were audited.

[9] Oirya does not explain how he gained personal knowledge of the other students' admission offer letters, and he did not submit copies of these letters to the Court.

status as doctoral students; were employed as graduate assistants; and taking the same core and required courses as me in the same Ph.D. program."

The statements in the above paragraph comprise Plaintiff's entire argument, pieced together from different sections of his brief, concerning similarly situated comparators for purposes of his § 1981 claim. This falls far short of what is required to establish a valid comparator. The Eleventh Circuit recently held that a plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that proffered comparators are "similarly situated in all material respects,"[10] and it must be done at the prima facie stage of the *McDonnel Douglas* burden-shifting framework, not at the pretext stage. *Lewis,* 918 F.3d at 1218.

In *Lewis*, an African-American female police officer who had previously suffered a heart attack was restricted by her doctor from being near pepper spray or a Taser. *Id.* at 1219. She was placed on unpaid administrative leave and instructed to complete FMLA paperwork for her absence. *Id.* When she exhausted her accrued leave in a few weeks but still had not turned in her FMLA paperwork, her absence was deemed "unapproved," and she was terminated. *Id.* As comparators, she identified (1) a white male who was given 90 days of unpaid administrative leave after he failed a portion of a physical fitness exam, during which time he passed the test, and (2) a white male who was given 90 days of unpaid administrative leave after he failed the agility test but who was eventually terminated after 449 days on unpaid administrative leave. The Eleventh Circuit stated that plaintiff's

---

[10] In adopting this standard, the Court stated that it is neither the plain-old "same or similar" or "nearly identical" standard, as past cases Eleventh Circuit cases "discordantly suggested," nor the Seventh Circuit's so-long-as-the-comparison-isn't-useless test. *Lewis*, 918 F.3d at 1218.

"broad-brush summary glosses over critical differences" in the other employees, specifically, that plaintiff and her comparators were placed on leave years apart, pursuant to altogether different personnel policies, and for altogether different conditions. *Id.* at 1229. As a result, the officers were not similar in all material respects and were not valid comparators. *Id.*

As in *Lewis*, Oirya glosses over the critical differences between the other Ph.D. students and himself. Oirya was disenrolled and terminated because Auburn discovered that he failed to submit an accurate and complete transcript from BYU and was prohibited from re-entering BYU. Plaintiff fails to mention this critical difference in his discussion on comparators. He has not identified a single comparator who failed to submit complete transcripts and was ineligible to return to his or her previous institution but was treated differently by Defendants. Instead, he argues that his comparators are similarly situated in ways that have nothing to do with the reason he was disenrolled or terminated. Oirya's argument is the equivalent of saying that an employee terminated for misconduct is similarly situated to all the other employees simply because they were hired at the same time, had the same job title, and performed the same duties. That type of comparison ignores the point of identifying a similarly-situated comparator: finding someone who did the same thing but was treated differently so as to justifiably give rise to an inference of discrimination.

> Absent a qualitative comparison at the *prima facie* stage—*i.e.*, without determining whether the employer treated like cases differently—there's no way of knowing (or even inferring) that discrimination is afoot. Think about it: Every qualified minority employee who gets fired, for instance, necessarily satisfies the first three prongs of the traditional *prima facie* case.

But that employee could have been terminated because she was chronically late, because she had a foul mouth, or for any of a number of other nondiscriminatory reasons. It is only by demonstrating that her employer has treated "like" employees "differently"—*i.e.*, through an assessment of comparators—that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful *discrimination*.

*Lewis*, 918 F.3d at 1223.

[A] similarly situated comparator will have engaged in the same basic conduct or misconduct as the plaintiff, will have been subject to the same employment policy, guideline, or rule as the plaintiff, will ordinarily have been under the jurisdiction of the same supervisor as the plaintiff, and will share the plaintiff's employment or disciplinary history. [*Lewis*, 918 F.3d] at 1227–28. A valid comparison turns "not on formal labels, but rather on substantive likenesses." *Id.* at 1228. "An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id.*

*Menefee v. Sanders Lead Co., Inc.*, No. 19-10433, 2019 WL 4466857, at *3–4 (11th Cir. Sept. 18, 2019) (finding that plaintiff failed to show that comparators were similarly situated in all material respects, in part because they did not engage in the same type of behavior). Because Plaintiff has not identified a single comparator who engaged in the same basic conduct or misconduct but was treated differently, he has failed to identify a valid comparator who is similarly situated in all material respects, and he cannot establish a *prima facie* case of intentional discrimination under § 1981.

## V. CONCLUSION

For all of the above reasons, it is hereby

ORDERED that Defendants' Motion for Summary Judgment (Doc. 79) is GRANTED.

Done this 2nd day of October, 2019.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
CHIEF UNITED STATES MAGISTRATE JUDGE